UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

_____

Lyon Financial Services, Inc. a )
Minnesota corporation, doing business ) Case File No. 08-CV-05523(DWF/JJK)
as USBancorp Business Equipment )
Finance Group, with its )
principal offices at Marshall, Minnesota, )
)
        Plaintiff, )
vs. )
)
Shyam L. Dahiya, M.D., Inc., a )
California corporation and Shyam L. )
Dahiya, individually, )
)
        Defendants, ) **DEFENDANT'S MEMORANDUM**
) **OF LAW IN OPPOSITION TO**
and ) **SUMMARY JUDGMENT**
)
Shyam L. Dahiya, M.D., Inc., a )
California corporation and Shyam L. )
Dahiya, individually, )
)
        Third Party Plaintiff, )
vs. )
)
Syneron, Inc, a Delaware corporation, )
)
        Third Party Defendant. )
_____

      Defendants, Shyam L. Dahiya, M.D., Inc., a California corporation and Shyam L. Dahiya (collectively "Dahyia"), individually, hereby submit their joint Memorandum of Law in Opposition Plaintiff, Lyon Financial Services, Inc. a Minnesota corporation, doing business as US Bancorp Business Equipment Finance Group, with its principal offices at Marshall, Minnesota ("U.S. Bank).

## **SUMMARY**

By way of background, this case involves the infamous "hell or highwater contract". Perhaps in some cases such odious contracts could be used legitimately but all too often they act as a cloak and a shield for fraud and under such contracts fraud victims can be put out of business or bankrupted or ruined personally. Many courts have sided with the financial sector against main street businesses and upheld such contracts and have enforced them against fraud victims. That is why some consider the "hell or highwater" contract the philosopher's stone of commercial fraud as such contracts can be used in a number of creative ways to separate the small business person from his or her money without any fear whatsoever of being held into account in court.

With that being said, in summary this case involves a sales contract for medical skin removal equipment for bariactric patients and essential services (the services are essential as the medical equipment, without proper training can main or kill patients).

Dahiya was supposed to enter into a lease with U.S. Bank but it appears that U.S. Bank never obtained title to equipment making the lease invalid as one quite simply cannot lease what one does not own. Dahiya never accepted the lease as the services and training associated with the produce were not tendered, and because this was a unitary contract with equitpment and essential services, there was no acceptance of the lease. Under Minnesota law, the provisions in the lease shielding U.S. Bank are invalid as they violate public policy and endanger the public health due to the extreme risk of injury and death if one separates the training from the use of the skin removal equipment.
As set forth herein, there are numerous fact issues precluding summary judgment— the case is not as cut and dried as U.S. Bank would have it.

**DISPUTED FACTS**

By way of background, Dr. Dahiya is a leading internationally recognized bariactric surgeon. (Affidavit of Shyam L. Dahiya, ¶ 10)("Dahiya Aff. ¶ __"). Syneron aggressively marketed its: elight System (1 Head System) and a Vela Elös System (1 Head System). Each "e" system included one software encrypted key and two pairs of operator protective eyewear for each application as well as a clinical device application and marketing material. (Dahiya Aff. ¶ 11).

According to Syneron, the ELOS system is a laser aesthetic procedure used to tighten the skin through a non-invasive surgical procedure as well as collagen remodeling. Further the product can be used for IPL skin rejuvenation and the removal of red vascular and brown pigment discoloration. (Dahiya Aff. ¶ 12).

Dr. Dahiya, as well as other leading bariatric surgeons, were feted by Syneron at "Mr. Chow's" restaurant in Beverly Hills California. At Mr. Chow's, Syneron conducted an aggressive sales and marketing presentation to the attendees. Dr. Dahiya, although reluctant, decided to buy the product in 2006 based on the representations and warranties provided by Syneron. (Dahiya Aff. ¶ 13).

Syneron heavily marketed medical products and services to Dr. Dahiya. The medical products and related services involved the removal of excess skin stemming from bariatric surgery. (Dahiya Aff. ¶ 14).Dr. Dahiya decided to use the product based upon numerous written and verbal representations by Syneron through its employees, agents, and officers. (Dahiya Aff. ¶ 15).

Syneron connected Dr. Dahiya to Syneron's financial partner, U.S. Bank Health

Finance, an affiliate and/or d/b/a of the Plaintiff. U.S. Bank Health Care finances Syneron's sales so Syneron could book a profit immediately and the customer would be left to pay for equipment and services over time plus interest to the lender. (Dahiya Aff. ¶ 16).

The Syneron sales representative promised Dr. Dahiya marketing and training support. This training and support was absolutely essential because misuse of the product, due to lack of training, could cause serious injury and/or death to his patients. (Dahiya Aff. ¶ 17).

Dr. Dahiya was to be assisted by "Kathy" from Syneron; she had years of experience in assisting medical practices and building their revenues. It was further anticipated that Dr. Dahiya was to participate in a video using the product with one of his patients—famous actress and media personality Carne Wilson. Syneron and Dr. Dahiya were to agree on a public relations venue and Dr. Dahiya was to be the only bariatric surgeon endorsing the treatment. (Dahiya Aff. ¶ 18).

Moreover, Dr. Dahiya was promised free marketing material, brochures, patient mailers, a patient waiting room video, on going support, ie. pricing, current competition, and how to create/build a medical spa. Syneron was to offer advanced training both on the technical and marketing side of things. (Dahiya Aff. ¶ 19).

Many of these representations were made by Syneron's territorial manager Mark Pawlowski. (Dahiya Aff. ¶ 20). Dr. Dahiya received the equipment but he was never given the training as promised. (Dahiya Aff. ¶ 21). In fact, another physician started to the same type of equipment on a patient but he almost immediately had to stop because that physician realized he did not have the training or knowledge on how to use the

equipment safely so he was forced to end the treatment prematurely because of the serious danger to the patient. (Dahiya Aff. ¶ 22).

Dahiya entered into a Sales Agreement with Syneron for both the purchase of medical equipment as well essential services related to the operation of such equipment, see Affidavit of Karl A. Oliver, Exhibit A (Sales Agreement between Syneron and Shyam Dahiya, M.D., Inc. ("Oliver Aff. ¶ 2. Ex.A"), the services were essential as misuse of the produce could cause serious to catastrophic injury or death. (Dahiya Aff. ¶ 22).

The equipment did not provide any income to Dr. Dahiya in spite of what had been represented. (Dahiya Aff. ¶ 23). Dr. Dahiya has seen no evidence that U.S. Bank ever obtained title to the property from Syneron, Inc. and Dr. Dahiya never transferred title to U.S. Bank Corp for the equipment in question and based on that, it appears that Syneron, Inc. still owns the equipment in question. (Dahiya Aff. ¶ 24).

Dr. Dahiya understands that Syneron in its agreement with him, that all obligations under my agreement with Syneron are binding on all assignees of Syneron, including all warranty obligations. (Dahiya Aff. ¶ 25).

Syneron has made many representations and warranties regarding the equipment that did not come to pass. Dr. Dahiya, suffice it to say, is distressed at what transpired. (Dahiya Aff. ¶ 26). For quite some time, Syneron has been well aware of the serious problems with the equipment provided to me, the complete lack of service and training, and Syneron's complete failure to follow through with its promises and representations. (Dahiya Aff. ¶ 28).

Michael R. Shapiro ("Mr. Shapiro") has been the managing partner of a MEDICAL MARKETING SERVICES, LLC ("MMS") since April 2004. (Affidavit of Michael R. Shapiro ¶1)("Shapiro Aff. ¶__").

MMS operates a website, www.liteandhope.com to educate and assist those suffering from Morbid Obesity seeking treatment options to deal with this disease. (Shapiro Aff. ¶ 2). MMS's mission is to focus on bariatric surgery (weight loss surgery) and to refer those suffering to highly qualified surgeons to perform bariatric surgery. (Shapiro Aff. ¶ 3).

One of MMS's affiliated surgeons, Dr. Shyam L. Dahiya, MD is one of the most highly qualified, experienced and renown bariatric surgeon that is and has been affiliated with MMS. (Shapiro Aff. ¶4).

In 2006, MMS was introduced to SYNERON, a company that manufactures and distributes laser devices that can deal with excess skin, a common problem many post bariatric surgery patients face.  It was the thinking of SYNERON that if they could demonstrate to bariatric surgeons that the could offer this service to their patients, this would create a valuable income stream for these surgeons rather than having then seek other doctors to deal with this problem. Syneron would obviously benefit by selling their laser machines to these new customers, i.e bariatric surgeons. (Shapiro Aff. ¶ 5).

The former CEO of Syneron, Doron Gerstel requested that MMS invite a group of the most prominent bariatric surgeons to a dinner and presentation hoping that this event would result in these surgeons entering into agreements to purchase/least these laser machines. (Shapiro Aff. ¶ 6).

The dinner took place at Mr. Chow's restaurant in Beverly Hills and Dr. Dahiya was one of the invited guests. Mr. Shapiro was at this dinner presentation. During that presentation, Mr. Gerstel made the following representations to those surgeons in Mr. Shapiro's presence:

    a. That SYNERON would provide an extensive training program for each surgeon that would lease/buy their equipment.
    b. That SYNERON would offer to each surgeon extensive marketing support to attract patients to their practices to deal with the "excess skin" issue.
    c. There would be no "up front" payment. In that regard, SYNERON was to provide the services of Kathy who was at the meeting who they represented had years of marketing experience and would be there to assist each surgeon at any time on marketing issues.
    d. SYNERON would guarantee "satisfaction" to each surgeon.

(Shapiro Aff. ¶ 7).

Dr Dahiya was then approached by one of the salesmen working for Syneron, Mark Poleski (unsure of spelling of last name) who told Dr Dahiya in Mr. Shapiro's presence that if Dr. Dahiya was unhappy with the equipment or the support system that Syneron was providing, he would arrange for Syneron to take the machines back with no further obligation on the lease agreement. (Shapiro Aff. ¶ 8).

In fact, the following took place:

    e. SYNERON offered NO training to Dr Dahiya, though requested on many occasions and oftentimes to me to see if I could help. I did make this request of Doron Gerstel but no training was offered.

    f. SYNERON did not offer any marketing support and Kathy who was paraded at the meeting as the marketing expert subsequent to Dr. Dahiya signing the lease agreement, left the employ of SYNERON.

    g. The offers of advance training and technical and marketing support were NEVER forthcoming.

    h. When I became aware of these facts, I so communicated them to Doron Gerstel at SYNERON but these requests for his assistance were never responded to.

      i.   When I learned of Mr. Gerstel leaving the company, I then contacted a gentleman named Don Fagen who represented himself as the new President of SYNERON, NA. I requested a meeting with Dr. Dahiya and Don Fagen to tell him that the behavior of SYNERON in this matter was improper and the SYNERON's behavior of assigning the lease agreement to a third party collection agency who was now suing Dr Dahiya was both morally and legally wrong.

      j.   Don Fagen, Dr. Dahiya and I actually meet for lunch on August 26, 2008 to discuss the matter fully.

      k.   Don Fagen indicated that he had no knowledge of these facts and would review the situation and then speak with me.

      l.   Don Fagen subsequently called me back to say that SNYERON's position was unchanged and that Dr Dahiya was thus required to defend the lawsuit file by SYNERON's assignee, Lyon Financial Services, Inc. as they were not prepared to assist right this obviously unjust situation accessioned by SYNERON's behavior and failure to live up their promises that were the inducement for Dr. Dahiya entering into the subject lease agreement.

(Shapiro Aff. ¶ 9).

It is Mr. Shapiro's opinion, based upon what has transpired, that the causes of action against Dr. Dahiya in this matter are without merit as the behavior of Syneron amounts to fraud and misrepresentations as he was induced to enter into the subject lease agreement under intentionally false and misleading information by Syneron and that the assignment of the subject lease to U.S. Bank is tainted by these acts of fraud and misrepresentation and thus should act as a bar and total defense to the action now pending against Dr. Dahiya. (Shapiro Aff. ¶ 10).

According to Mr. Shapiro, Dr. Dahiya is an honorable and descent man. Based on what has transpired, Mr. Shapiro has concluded that this action against Dr. Dahiya, in Mr. Shapiro's eyes, is legally without merit and is morally a disgrace. (Shapiro Aff. ¶ 11).

## **STANDARD OF REVIEW**

Summary judgment is appropriate when the court finds that there are no genuine issues of material fact. *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn. 1993). *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Immaterial or minor facts and feigned issues cannot prevent summary judgment. *Celotex*, 477 U.S at 322-23**.** If the moving party comes forward with information that appears to establish that no factual dispute exists, the burden shifts and the non-moving party has the burden of establishing that genuine issues of material fact do exist. *Nord v. Herreid*, 305 N.W.2d 337, 339 (Minn. 1981).

The non-moving party cannot merely rely on conclusory statements in affidavits or allege that a genuine issue of material fact exists, but must demonstrate the existence of specific facts that create an issue for trial**.** *Celotex*, 477 U.S at 322-23; Minn. R. Civ. P. 56.05.

For the purposes of summary judgment, materiality of facts is measured by whether a given fact might affect the outcome of a claim or defense under the governing law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Accordingly, a court must identify the elements of the claims or defense at issue before examining the evidence or record for the existence of material fact disputes. *Illinois Farmers Ins. Co. v. Tapemark Co*, 273 N.W.2d 630, 634 (Minn. 1978); *In re Jolly's Inc*., 188 B.R. 832, 838 n.7 (Bankr. D. Minn. 1995). Evidence from the respective sides must then be linked to one or more of those identified elements. *Id*. at 837.

In other words, a party may move for summary judgment by gleaning the elements of its claim, garnering its evidence, and pointing out that the evidence meets all of the elements and does not establish any affirmative defense. *Celotex Corp.,* 477 U.S. 317, 325; *In re Mathern*, 137 B.R. 311, 314 (Bankr. D. Minn. 1992).

A fact is material only when its resolution affect the outcome of the case. *Anderson,* 477 U.S at 248 . If a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *Celotex*, 477 U.S at 324

Assuming the moving party has met its initial burden, the non-moving party then bears the burden of production of evidence; it can avoid a grant of summary judgment for the non-moving party only by producing evidence that would support findings in its favor on the elements in question. *Anderson,* 477 U.S. at 248. The non-moving party can also move for summary judgment on any claim or defense and same analysis applies.

## **DISCUSSION**

**I.   U.S. BANK NEVER TOOK TITLE TO THE PROPERTY IN QUESTION, THEREFORE, IT DOES NOT HAVE STANDING AS A LESSOR UNDER THE LEASE AS OWNERSHIP OF THE PROPERTY IN QUESTION IS A CONDITION PRECEDENT TO THE LEASE'S FORMATION**

A condition precedent is an event that must occur before a party is required to perform a certain contractual duty. *Minnwest Bank Cent. v. Flagship Properties*, 689 N.W. 2d 295, 299 (Minn. Ct. App. 2004)(citing *Carl Bolander & Sons, Inc. v. United Stockyards Corp.*, 215 N.W. 473, 476 (Minn. 1974)(relying on Williston on Contracts Section 6711 (3rd ed. 1961)). "Loan approval for example is a typical condition precedent in real estate transactions. Loan approval is an independent event that occurs

10

after the contract if formed which triggers the obligation of the parties under the contract." *Taylor v. Inv. Corp. Weil*,169 F Supp. 2d 1046 1056 (D. Minn. 2001)(citing *Scott v. Forest Lake Chrysler-Plymouth Dodge*, 611 N.W2d 346, 350 n.6 (Minn. 2000).

Another example of a condition precedent is when an offer to buy property is contingent upon a buyer being able to obtain financing. If a buyer cannot obtain financing the buyer is not in breach for failure to complete the sale. The ability to obtain financing was the condition precedent. *Aslakson v. Home Sav. Ass'n*, 416 N.W.2d 2d 786, 787, 790 (Minn. Ct. 1987); *451 Corp, v. Pension Sys. for Policemen & Firemen*, 310 N.W.2d 922, 923-24 (Minn. 1981)(discussing application of conditions precedent would have obligated a lender to convert short term financing to a long term loan).

Accordingly, "[w]hen a contract contains a condition precedent, a party to the contract does not acquire any rights under the contract unless the condition occurs. *Aslakson*, 416 N.W. 2d at 789. In a breach of contract claim, a plaintiff, as an essential element of his or her claim, must show that all conditions precedent were performed *Taxi Connection v. Dakota MN & Eastern R.R. Corp,* 515 F.3d 823, 826(8th Cir. 2008).

U.S. Bank purports to be a lessor. It is axiomatic that to be a lessor one needs to own the property than one is purporting to lease. If there is no sale of property, there is no right to collect rent on a lease. *Eureka Broadband Corporation v. Wentworth Leasing Corporation*, 400 F.3d 62, 66 (1St Cir. 2005).

In this case, there is no evidence that Syneron transferred title to U.S. Bank. There is no Bill of Sale transferring title to the Property (which there would be required with a sale price of over 130,000.00). Because title/ownership of the property has not been transferred to U.S. Bank, the lease was never operative and it is void for failure of a

condition precedent to occur. *See Taylor Inv. Corp v. Weil*, 169 F.Supp.1046, 1056 9D. Minn. 2001)(stating that a condition precedent is on which is to be performed before the agreement of the parties becomes operative(citation omitted).

The lease in question claims that U.S. Bank is the owner but there has never been a transfer of title to U.S. Bank. The "purchase", along with transfer of the title "is a condition precedent to this Lease" . . . . *See* (Affidavit of Shannon Vandavere, Ex. B). The Sales Agreement requires Syneron to transfer title to U.S. Bank if Dahiya was to obtain third party financing. (Oliver Aff.¶ 2, Ex. A).

There are fact issues relating to whether title was passed to U.S. Bank and if title was not passed, the Lease between U.S. Bank and Dahiya should be rescinded for failure of a condition precedent to occur. The lease failed to become operative because U.S. Bank never obtained title to the equipment in questions, therefore, because a condition precedent failed the lease in question in void and the only result can be rescission.

**II.   DAHIYA NEVER LEGALLY ACCEPTED THE PROPERTY IN QUESTION BECAUSE THE SALES AGREEMENT WAS AN AGREEMENT FOR PROPERTY/ ESSENTIAL SERVICES AND IT IS UNDIPSUTED THAT THE SERVICES WERE NEVER TENDERED**

A contract does not exist unless the parties have agreed "with reasonable certainty about the same thing and on the same terms." *Peters v. Mut. Ben. Life Ins. Co.*, 420 N.W.2d 908, 914 (Minn. Ct. App. 1988). *Gresser v. Hotzler*, 604 N.W.2d 379, 382 (Minn. App. 2000). Under that rule, 'an acceptance must be coextensive with the offer and may not introduce additional terms or conditions.'" *Gresser,* 604 N.W.2d. at 382 *See Rose v. Guerdon Indus., Inc.*, 374 N.W.2d 282, 284 (Minn. App. 1985) (acceptance that seeks to

vary, add to, or qualify the terms of an offer constitutes a rejection of the offer and a counteroffer).

The Sales Agreement between Syneron and Dahiya's company was an agreement for both goods and services. *See* Oliver Aff. 2, Ex. A). Acceptance could only occur on both performance of the goods and the services for without the services accompanying the equipment, serious injury or death to patients could occur. Dahiya made repeated complaints himself and through Mr. Mickey Shapiro, to Syneron about the fact that the services were had not been tended. There was no acceptance as there was no tender of the goods and services contracted for, the services being essential for the functioning of the equipment. All that was delivered was the goods; acceptance could not be made without both the tender of the contracted goods and services. Because there was no acceptance of the goods and services in question, there was no acceptance and hence no lease was entered into.

In the alternative, Syneron was providing a counteroffer to Dahiya for goods alone and because Syneron would then be modifying the contract, Dahiya had the right to reject it or alternately it would because void by his company not accepting it.

III. **UNDER DAHIYA'S SALES AGREEMENT WITH SYNERON, THE SALES AGREEMENT, INCLUDING WARRANTIES AND OTHER RIGHTS, ARE BINDING ON ALL ASSIGNEES.**

Under Minnesota law and assignment vests in the assignee the same right, title or other interest that the assignor has in the things assigned. *Britamco Underwriters v. A& A Liquors*, 649 N.W.2d 867, 870 (Minn. Ct. App. 2002)(citing *State ex. Re. Southwell v. Chamberland*, 361 N.W.2d 814, 818 (Minn. 1985); *S O Designes USA, Inc. v.*

13

*Rollerblade, Inc.*, 620 N.W.2d 48, 54 (Minn. Ct. App. 2000)(stating that an assignment is a transfer of rights or property). Therefore, "'the assignee stands in the shoes of the assignor.'" *Id*. (quoting *Geldert v. American Nat'l Bank*, 506 N.W.2d 22, 29 (Minn. Ct. App. 1993).

The fundamental principle that an assignee merely steps into the shoes of an assignor under Minnesota law is mirrored in many other U.S. jurisdictions. If an assignor assigns a note with a security interest to an assignee where the note has been satisfied, the assignee takes nothing from the assignment. *Aird Ins. Agency v. Zions First Nat. Bank,* 612 P.2d 341, 343 (Utah 1980). An assignee in those circumstances steps into the shoes of the assignor and "since the assignee gains nothing more, and acquires no greater interest than had his assignor. . . " an assignee acquires "nothing by virtue of the assignment." *Id*.

If there is a question of whether the transaction is a sale or a lease, that determination must go to the fact finder. *Lyon Financial Serives, Inc. d/b/a U.S Bank Portfolio Services, v. Woodlake Imaging, LLC*, 2005 WL 331695 (E.D. Pa)(denying motion for summary judgment by U.S. Bank (Lyon) based on a "hell or high water" contract theory because issues of fact regarding whether the transaction was a sale or lease); *see also Key Equitpment Finance inc. v. Pioneer Transportation, Ltd*. 472 F. Supp. 2d 1131 (W.D.Wis. 2007).

Under the *Key* court's decision, the treatment of a lease as a sale to which Article 2 of the Uniform Commercial Code (Sales of Goods) ("UCC_-_") applied instead of a lease, led it to consider two UCC defenses raised by the lessee that 1) the goods were

14

non-conforming and the lessee had a right to revoke its acceptance and then under UCC 2-608 and then cancel the contract under UCC 2—711.

Under Section 14 of the Sales Agreement between Syneron and Dahiya's company, the terms and conditions of the equipment /services agreement shall "insure to the benefit of and be binding on the representatives, heirs, legal personal representatives, successors and permitted assigns of the parties." *See Oliver* Aff. ¶ 2, Ex. A.)A third party lessor is expressly contemplated as an assignee under the Sales Agreement. *Id*. Even if one assumed that title to the equipment passed to U.S. Bank, U.S. Bank is an assignee under the Sales Agreement, thus Dahiya retains the same defenses for breach of contract, warranty, and his other claims and remedies against U.S. Bank as assignee and it does with Syneron the assignor.

IV.   **DR. DAHIYA WAS FRAUDULENTLY INDUCED TO ENTER THE PURCHASE AGREEMENT AND"LEASE AGREEMENT AND UNDER THE CIRCUMSTANCES, HE IS ENTITLED TO RECSISSION OF THE LEASE.**

The elements for fraudulent inducement are where a party: 1) Made a representation (2) That was false (3) Having to do with a past or present fact (4) That is material (5) And susceptible of knowledge (6) That the representor knows to be false or is asserted without knowing whether the fact is true or false (7) With the intent to induce the other person to act (8) and the person in fact is induced to act (9) In reliance on the representation [and] (10) That the plaintiff suffered damages (11) Attributable to the misrepresentation. *M.H. v. Caritas Family Servs.*, 488 N.W.2d 282, 289 (Minn. 1992).

Here there is substantial evidence on the record that Dayhiya was defrauded by Syneron via fraudulent statements made to induce him into entering into the Sales Agreement and Lease. (Dahiya Aff. ¶¶ 2-17) and (Shapiro Aff. ¶¶ 2-12).  U.S. Bank, as

an assignee within the meaning of the the Sales Agreement, is liable to Dahiya for the remedy of rescission based upon the assignor Syneron's conduct because under Minnesota law an assignee steps into the same shoes as that of the assignor. Therefore, U.S. Bank does not have made the fraudulent statements itself.

Here, Dahiya argues that the agreement with U.S. Bank is really a sales contract as the lease did not become operative and because under the Sales Contract there is a provision that its terms are binding on assignees. Dahiya has submitted evidence that the equipment in questions was woefully inadequate not to mention the complete failure of the tendering of services. (Dahiya Aff. ¶¶ 18-15).

**V.    DAHIYA'S CONTRACTUAL DUTIES ARE EXCUSED UNDER MINNESOTA LAW FOR IMPOSSIBLITY AND FRUSTRATION OF PURPOSE**

"Generally, contract performance is excused when it is hindered or rendered impossible by the other party." *Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 45 (Minn. 1984). It must be the case that the prevented performance would have occurred absent the hindrance or prevention. *Nodland v. Chirpich*, 307 Minn. 360, 366-67, 240 N.W.2d 513, 516 (1976). "[E]very contract contains an implied condition that each party will not unjustifiably hinder the other from performing." *Zobel & Dahl Constr.*, 356 N.W.2d at 45. Courts have set aside contractual obligations in situations in which one party tried to escape its own duty or to frustrate the others performance. *Id*.

Here the use of the equipment in question was made impossible for the failure to provide services per the Sales Contract. Further, since U.S. Bank did not obtain title to the goods and has provided no Bill of Sale evidencing the same, the lease never went into effect. Even if the lease were in effect, under Sales Agreement all of Syneron's

obligations vest in an assignee such as U.S. Bank under the express wording of the sales contract. Therefore, since the performance was made impossible and the purpose of the Sales Agreement was frustrated, Dahiya has no obligations to U.S. Bank as the assignee of the Syneron Sales Agreement.

## VI.   DAHIYA IS ENTITLED TO RECSISSON UNDER THE THEORY OF MUTUAL MISTAKE

Rescission of a contract for mistake . . . is ordinarily founded upon either mutual mistake of the parties or a mistake by one induced or contributed to by the other. *TNT Props., Ltd v. Tri-Star Developers LLC*, 677 N.W.2d 94, 102 (Minn. Ct. App. 2004); *Gethsemane Lutheran Church v. Zacho*, 258 Minn. 438, 443-45, 104 N.W.2d 645, 649 (1960).

It this matter, it is undisputed that both U.S. Bank and Dahiya were under the mistaken impression that Syneron would tender services to make the equipment safe for use on patients. That mutual mistake requires rescission – to do otherwise would be wholly inequitable. There are fact issues regarding mutual mistake that preclude summary judgment.

## VII.   U.S. BANK'S HIGH OR HELL WATER CONTRACT VIOLATES PUBLIC POLICY AND IS UNENFORCEABLE UNDER MINNESOTA LAW

U.S. Bank's hell or high water lease contract is in effect an exculpatory contract – that U.S. Bank is refusing to accept the social consequences of its lending practices, including due diligence requirements. An exculpatory clause is unenforceable if it is ambiguous in scope, purports to release the benefited party from liability for intentional,

willful or wanton acts; or contravenes public policy. *Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 923 (Minn. 1982).

In determining whether an exculpatory clause violates public policy, Minnesota Courts consider: (1) Whether there was a disparity in bargaining power between the parties and (2) The types of services being offered or provided, taking into consideration whether they are public or essential services. *Id.*; *see also* Restatement (Second) of Contracts § 195(2)(b) (1981) (stating that "[a] term exempting a party from tort liability for harm caused negligently is unenforceable on grounds of public policy if * * * the term exempts one charged with a duty of public service from liability to one to whom that duty is owed.").

In examining whether the service being offered is a public or essential service, we "consider whether it is the type generally thought suitable for public regulation." *Schlobohm*, 326 N.W.2d at 925. "Types of services thought to be subject to public regulation have included common carriers, *hospitals and doctors*, public utilities, innkeepers, public warehousemen, employers and services involving extra-hazardous activities." *Id*. (footnotes omitted).

In this case, he services were simply not severable from the equipment itself because of the substantial risk of death and critical injury that could occur without the proper training. The transaction was unitary in nature with the equipment and services – to allow U.S. Bank to split the transaction would be against public policy due to the grave harm that could occur to the public is medical equipment is used without the required training services. *See* (Dahiya Aff. ¶¶ 18-15). Under *Schlobohm*, this Court cannot enforce provisions in a "hell or highwater" contract that could reasonably put the public's

lives in danger. This medical equipment /services contract falls within the orbit of *Schobohm* and its progeny. The Court cannot enforce exculpatory provisions in the lease in question as they are void as against public policy. There are at a minimum genuine issues of fact remain that preclude summary judgment.

## CONCLUSION

Defendants, Shyam L. Dahiya, M.D., Inc., a California corporation and Shyam L. Dahiya (collectively "Dahyia"), individually, respectfully requests that the Plaintiff, Lyon Financial Services, Inc. a Minnesota corporation, doing business as US Bancorp Business Equipment Finance Group, with its principal offices at Marshall, Minnesota's, Motion for Summary Judgment be denied in its entirety because there are a plethora of fact issues precluding the granting of the Plaintiff's Motion as discussed herein.

THE OLIVER GROUP, PLC

Dated: 30 November 2009                    /s/ Karl A. Oliver         .
                                          Karl A. Oliver, Esq., # 0269852
                                          1935 W. County Road B2, Suite 415
                                          Saint Paul, Minnesota 55113
                                          Telephone: 651-636-7960

                                          *Attorneys for Defendants Shyam L. Dahiya, M.D., Inc., a California corporation and Shyam L. Dahiya, individually,*

## CERTIFICATE OF COMPLIANCE

This memorandum has approximately 5146 words and is in compliance with page limits requirements under the Local Rules. This document is created through Microsoft Word 2003.

November 30, 2009 /s/ Karl A. Oliver

_____

Karl A. Oliver